**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

ROBERT MCCANN,                    :     Civil Action No. 06-3189(NLH)
                                  :
        Plaintiff,                :
                                  :
    v.                            :     **OPINION**
                                  :
WINSLOW TOWNSHIP, ET AL.          :
                                  :
        Defendants.               :


**APPEARANCES:**

Robert McCann
16 B White Horse Pike
Chesilhurst, NJ 08089

*Pro Se Plaintiff*


Michael O. Kassak
David M. Ragonese
White & Williams, LLP
457 Haddonfield Road
Suite 400
Cherry Hill, NJ 08002

*Attorneys for Defendants Winslow Twp., Winslow Twp. Police Dept.,
Officer Mark Passarella, Chief Anthony Bellos, and Officer
Pizzico*


**HILLMAN***, District Judge*


I. <u>Introduction</u>

    This matter has come before the Court on Defendants' motion
for summary judgment on Plaintiff Robert McCann's § 1983 action
for alleged constitutional rights violations.  The Court's

1

subject matter jurisdiction over McCann's underlying claim is conferred by 28 U.S.C. § 1331 (federal question jurisdiction). For the reasons expressed below, Defendants' motion will be granted.

## II. <u>BACKGROUND</u>

The allegations set forth in this case stem from a traffic stop involving Plaintiff Robert McCann's brother, Michael Dickerson.  On April 27, 2006, Dickerson was stopped in his vehicle by Defendant Officers Passarella and Pizzico after Passarella noticed that Dickerson was driving without a seatbelt. Dickerson was subsequently issued citations for failure to wear a seat belt, failure to produce a driver's license upon request and fraudulently displaying an inspection sticker on the vehicle.

During the stop, Dickerson called McCann, who arrived to the scene shortly thereafter.  McCann was instructed by Pizzico to remain near his vehicle until Passarella was finished with the stop of Dickerson.  After Passarella issued the citations to Dickerson, he and McCann had an exchange of words that McCann would later recount during his deposition:

> Q: Did you ultimately tell [Passarella] who you are?
> A: Yes.
> Q. Did you have any further discussion?
> A. I told him that I was Robert McCann. And he said: What are you doing here? I said: This is my brother and these other two people that you have out here, are my constituents. They're from Chesilhurst and I'm a councilman from Chesilhurst. They asked me to come to the scene to give them a ride and that's why I am here.

        Q. Was there anything else said between the two of you?
        A. Yes. He said: You're from Chesilhurst? And I said: Yes.
           He said you're a councilman from Chesilhurst? I said:
           Yes. He said: I don't give a damn about that. All the
           people in Chesilhurst are stupid anyway. You people don't
           know how to do anything over there. We have to show you
           how to do something. We have to show you how to do things
           right here in Winslow Township.

    Following this interaction, McCann went to the Winslow

Township Police Department ("the Winslow Police") with Dickerson

to register a citizen's complaint against Passarella.

Dickerson's complaint alleged that Passarella "became very

combative and derogatory" during the traffic stop.

    A few weeks later, on May 16, 2006, McCann was pulled over

in his vehicle by Pizzico and issued a citation for driving with

a broken taillight.  Pizzico had McCann exit his vehicle and walk

to its rear so that he could see the broken taillight first-hand.

As Pizzico made her way back to her patrol car, McCann overheard

her state on her cellular phone: "I got him."  Following this

traffic stop, McCann went to the Winslow Police to register a

citizen's complaint against Pizzico.  In that complaint, McCann

asserted that the recent traffic stop and citation were

"retaliatory in nature," racially motivated, and that Pizzico

"never got close enough to [the] vehicle [before initiating the

traffic stop] to notice [the] small hole in [the] taillight."

Later, during his deposition, McCann discussed the specifics of

the damage to his taillights:

    A:  No.  What I am saying to you your question is, I don't

                                3

```
          remember it being broken at that time.  I remember
          getting a ticket and then noticing that it was broken.
     Q:   Which side did you notice it was broken?
     A:   After I got the ticket, the left side rear.
     Q:   How about the right side?
     A:   I think there was a crack.
     Q:   How big was the left side?
     A:   I don't think the left side was visible.  I don't think
          - you had to be right up on it.
     Q:   How about the right side?
     A:   The right side might have been a noticeable crack.
```

In the same deposition, McCann also responded to questioning about his accusation in the citizen's complaint against Pizzico that the traffic stop on May 16, 2006, was motivated in part by racial animus:

```
     Q: Now, did you ever mention verbally that you thought the
        stop was based on race as well as being retaliatory?
     A: No.  I always said I thought the stop was based on
        retaliation.
```

Six weeks later, on June 30, 2006, McCann was stopped in his vehicle by Passarella.  When McCann asked Passarella why he was stopped, Passarella responded by saying "[y]ou don't need to know that.  You need to listen to me and give me your license and registration."  Passarella issued McCann citations for failing to yield and for failing to maintain the vehicle's lamps.  McCann exited his vehicle and inspected the rear, confirming that his taillights were indeed in need of repair.

Passarella documented the stop in a police report dated June 30, 2006, wherein he stated that "[w]hile waiting for the traffic light...a blue pickup truck was going straight across the light,

4

then darted to its left...in front of oncoming traffic, causing myself and other traffic to stop." Passarella further noted in the report that "[t]he driver also did not use his left turn signal to make his turn from his lane of travel."

McCann's passenger in the vehicle, one Reggie Bethune, discussed the left turn during his deposition on March 12, 2007:

> Q: And could you describe how Mr. McCann made that left turn onto Route 73?
> A: I know there was another car there, and he had to go around it and made [sic] a left. I don't think we got – I don't think we got a hundred feet off after the turn that he was pulling us over.
> Q: Okay. Now, when you say there was another car there, what do you mean?
> A: There was another car in the way where you had to go around it to make the turn, and that's when he pulled us over. As soon as we made the turn that's when he pulled us over.
> Q: And this car was blocking the intersection; is that what you're saying?
> A: Something like that.

Immediately following the June 30, 2006, traffic stop, McCann and Bethune drove to the Winslow Township municipal building to remove garbage from McCann's vehicle and place it in the garbage dump. Both the Winslow Township municipal dump and the police station are located on the municipal building's property. Only Winslow Township residents are permitted to deposit their trash at the dump. While McCann was not a resident of Winslow, Bethune was.

Passarella had followed McCann back to the municipal building after the traffic stop, and objected to McCann's use of

5

the municipal dump.  After Bethune was able to confirm that he was a resident of Winslow Township, and that the trash belonged to him and not McCann, McCann was permitted to deposit the trash from his vehicle.  McCann then turned to Passarella and said: "[y]ou're just not going to give me a break, are you?" Passarella responded by saying: "[n]o.  If you don't like it, sue me."

McCann then filed a second citizen's complaint against Officer Passarella.  In that complaint, McCann asserted that Passarella was "retaliating because I filed a complaint[1] against him," and also that "the Administration" was "condoning" a practice of racism.  McCann also initiated a civil action in this Court on July 14, 2006.

On August 7, 2006, the Camden County Office of the Prosecutor initiated a criminal investigation of the citizen's complaints filed by McCann against Pizzico and Passarella.  The Winslow Police conducted an internal investigation as well.  Both the Prosecutor's Office and the Winslow Police found insufficient credible evidence to substantiate McCann's allegations.

On October 31, 2006, McCann pleaded guilty to both the May 16, 2006 ticket issued by Pizzico, and the June 30, 2006 ticket issued by Passarella.  On April 13, 2007, the Defendants in this

---

[1] This refers to the "citizen's complaint" filed with the Winslow Police.

6

case moved for summary judgement.

### III.  <u>SUMMARY JUDGEMENT STANDARD</u>

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56©).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. <u>Id.</u> In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." <u>Marino v. Industrial Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004)(quoting <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. <u>Catrett</u>, 477

7

U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

When applying the summary judgment standard to a case involving a *pro se* litigant, district courts must be mindful of the Supreme Court's directive that "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  Estelle v. Gamble, 429 U.S. 97, 107 (1976); but see Sykes v. Blockbuster Video, No. 06-1745, 2006 WL 3314518, at *2 (3d Cir. 2006)(finding that *pro se* plaintiffs are expected to comply with the Federal Rules of Civil Procedure).

## IV. DISCUSSION

Plaintiff McCann alleges that the Defendants in this case, either personally or vicariously, violated his constitutional rights protected by the First, Fourth and Fourteenth Amendments.

McCann is seeking relief pursuant to 42 U.S.C.A. § 1983.  To
support his claims, McCann argues that the traffic stops on May
16, 2006 and June 30, 2006, were made in retaliation to his
filing of citizen's complaints with the Winslow Police
Department.  McCann also argues that the traffic stops on April
27, 2006, May 16, 2006 and June 30, 2006, were unreasonable
seizures in contravention of the Fourth Amendment to the
Constitution.  Finally, McCann alleges that the Winslow Police
have "practiced racial profiling and discriminat[ion] against
drivers who are African American," that "the Governing Body of
Winslow Twp since 2000 has condoned this practice," and that he
has been victimized by this practice.  Because this Court finds
that Defendants have met their the burden of demonstrating the
absence of a genuine issue of material fact with respect to each
of Plaintiff's claims, the Defendants' motion for summary
judgment will be granted.

**A.  Constitutional Claims Against Passarella And Pizzico**

The qualified immunity analysis provides the basis to
determine whether a claim for a constitutional violation by a law
enforcement officer is viable, and it is our necessary starting
point for this discussion.[2]  The standard promulgated by the

---

[2] See <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001) (stating
that because qualified immunity is "an immunity from suit rather
than a mere defense to liability," "we repeatedly have stressed
the importance of resolving immunity questions at the earliest
possible stage in litigation.")

Third Circuit is as follows:

> Qualified immunity protects law enforcement
> officers from being tried for actions taken in the
> course of their duties.  If the immunity applies,
> it entitles the officer to be free of the 'burdens
> of litigation.' But the immunity is forfeited if
> an officer's conduct violates 'clearly established
> statutory or constitutional rights of which a
> reasonable person would have known.' To determine
> ... whether the officers have lost their immunity,
> we must engage in a two step analysis. First, we
> must decide 'whether a constitutional right would
> have been violated on the facts alleged'...
> Second, if we believe that a constitutional
> violation did occur, we must consider whether the
> right was 'clearly established.'  The question is
> 'whether it would be clear to a reasonable officer
> that his conduct was unlawful in the situation he
> confronted.' This is an objective inquiry, to be
> decided by the court as a matter of law.

Doe v. Groody, 361 F.3d 232, 238 (3d Cir. 2004) (internal

citations omitted).  Thus, in order to determine whether

Plaintiff's claims against the officers are viable, it must first

be determined whether the officers violated Plaintiff's

constitutional rights.  Then, if a constitutional right has been

infringed, it must be determined whether that right was "clearly

established" at the time of the constitutional violation.  McCann

alleges that his First, Fourth and Fourteenth Amendment rights

were violated by Passarella and Pizzico, and this Court will

address each claim in that order.

### 1.   The First Amendment Retaliation Claims Against Passarella and Pizzico.

The thrust of McCann's retaliation claim is that the traffic

stops on May 16, 2006, and June 30, 2006, were motivated by the

citizen's complaints against Pizzico and Passarella that McCann filed with the Winslow Police.

In the landmark decision of <u>Mt. Healthy Bd. of Ed. v. Doyle</u>, 429 U.S. 274, 287 (1977), the Supreme Court identified a three-part test for First Amendment retaliation claims under § 1983.  A recent, and neatly summarized, version of this test by a Wisconsin District Court is worth repeating:

> [D]id the plaintiff engage in conduct protected by the Constitution; if so, can the plaintiff show that the defendant was motivated to take an adverse action against the plaintiff because of the protected conduct; and, if so, can the defendant show that he would have taken the same action, even if the plaintiff had not exercised a constitutional right?

<u>Gullick v. Ott</u>, No. 06-C-707-C, 2007 WL 2932768, *4 (W.D. Wis. Oct. 9, 2007).  The Third Circuit has in certain instances used a different, though substantively equivalent, ideation in First Amendment retaliation claims under 1983.  <u>See</u> <u>Anderson v. Davila</u>, 125 F.3d 148, 161 (1997).[3]  This Court will apply to the instant

---

[3] <u>Compare</u> <u>Ambrose v. Township of Robinson, Pa.</u>, 303 F.3d 488, 493 (3d Cir. 2002)("First, a plaintiff must show that his conduct was constitutionally protected. Second, he must show that his protected activity was a substantial or motivating factor in the alleged retaliatory action. Finally, the defendant may defeat the plaintiff's case by showing that it would have taken the same action even in the absence of the protected conduct.")(internal citations omitted); <u>Feldman v. Philadelphia Housing Authority</u>, 43 F.3d 823, 830 (3d Cir. 1994)(same) <u>with</u> <u>Livingston ex. rel. Livingston v. Borough of McKees Rocks</u>, 223 Fed.Appx. 84, 88 (3d Cir. Mar. 6, 2007)(claimants must show "(1) that [they] engaged in protected activity; (2) that the government responded with retaliation; and (3) that the protected activity was the cause of the retaliation"); <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 512

case the three-part inquiry used by the Third Circuit in <u>Davila</u> and its progeny, as that line of case law provides more factually analogous circumstances: 1) did McCann engage in constitutionally protected activity?; 2) if so, did the Winslow Police respond with retaliation; and 3) if so, was the protected activity the cause of the retaliation, or would the Winslow Police have taken the adverse action regardless?[4]   <u>Id.</u>

McCann can easily satisfy the first element of this test, as the citizen's complaints constitute activity protected by the First Amendment.[5]   As to the second element, this Court finds that multiple traffic stops culminating in the issuance of citations is adverse governmental action that could substantiate

_____

(3d Cir. 2003)(same); <u>Davila</u>, 125 F.3d at 161 (same).
   The former line of cases deal with an employment relationship between the claimant and defendant or defendants. The latter, though derivative of an employment discrimination case, is more comparable to the instant case wherein the claimant is a private citizen seeking redress against a government entity or agent.

   [4] This Court finds it prudent to make specific reference to the burden-shifting that takes place between elements two and three of the test, as identified in <u>Mt. Healthy</u>, because this aspect of the test is generally outcome-determinative.

   [5] The Third Circuit's thorough analysis of the First Amendment's Petition Clause in <u>Foraker v. Chaffinch</u>, No. 06-4086, 2007 WL 2445561, at *3-6 (3d Cir. Aug. 30, 2007), makes clear that the formal mechanism of filing a grievance with a municipal police department is within the realm of activity clothed in constitutional protection from retaliation.  Defendants readily concede this element in their brief as well: "For purposes of this motion, the Defendants stipulate that McCann's complaints to the Winslow Township Police Department constitute protected First Amendment activity."  Df. Br. at 11.

a claim of First Amendment retaliation.

In order to satisfy the third element of the test, McCann would have to show that his filing citizen's complaints against Passarella and Pizzico was the cause of the alleged retaliation. If the defendants can show that Pizzico and Passarella would have taken the same adverse action against McCann absent the citizen's complaint, McCann's claim must then fail.

For McCann to show a causal link between his citizen's complaints against Pizzico and Passarella and the two traffic stops at issue, he would need to show, at the very least, that the officers were aware of his engaging in protected activity. See Red v. Potter, 211 Fed.Appx. 82, 84-85 (3d Cir. 2006); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). "Knowledge alone, however, does not establish a causal connection" between the protected activity and the adverse action. Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004).

There must also be some degree of temporal proximity to suggest a causal connection, and that temporal proximity should be "unusually suggestive." Marasco, 318 F.3d at 512. "A lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse ... action ... negates any inference that a causal connection exists between the two." Dowe, 145 F.3d at 657. The Third Circuit has held that such an

13

inference could be drawn where two days passed between the
protected activity and the alleged retaliation, see Jalil v.
Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), but not where 19
months had elapsed, see Krouse v. American Sterilizer Co., 126
F.3d 494, 503 (3d Cir. 1997).

Clearly, though, "there is...a difference between two days
and nineteen months." Farrell v. Planters Lifesavers Co., 206
F.3d 271, 279 n. 5 (3d Cir. 2000).  However, the Third Circuit
has offered other examples of when temporal proximity is not
"unusually" or "unduly suggestive."  See id.; see also Williams
v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 760
(3d Cir. 2004) (holding that two months was not "unduly
suggestive"); Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d
Cir. 2003)(holding that three weeks was not "unduly suggestive").

Using time to satisfy the causation element of the *prima
facie* case, however, requires consideration "with a careful eye
to the specific facts and circumstances encountered." Farrell,
206 F.3d at 279, n. 5 (citing Kachmar v. SunGard Data Sys., 109
F.3d 173, 178 (3d Cir. 1997)).  Thus, while the aforementioned
cases in this section are indeed helpful, they are by no means
determinative of the temporal proximity inquiry.

With that in mind, we turn to the specific, undisputed facts
of McCann's case.  Immediately following his interactions with
Pizzico and Passarella on April 27, 2006, McCann filed a

14

citizen's complaint against Passarella.  He did not register a citizen's complaint against Pizzico.  On May 16, 2006, McCann was pulled over in his vehicle by Pizzico.  He was issued a citation, and immediately following the traffic stop, McCann filed a citizen's complaint against Pizzico.  In the citizen's complaint, McCann alleged that the traffic stop was in retaliation for the citizen's complaint filed on April 27, 2006.  On June 30, 2006, McCann was pulled over in his vehicle by Passarella.  Thereafter, McCann filed a second citizen's complaint against Passarella.  In the second citizen's complaint, McCann again alleged that the traffic stop was in retaliation for the citizen's complaint filed on April 27, 2006.

This Court finds that temporal proximity between McCann's filing of the citizen's complaint on April 27, 2006, and the two traffic stops that occurred approximately three and nine weeks thereafter is not "unusually suggestive."  This finding is not only derivative of an examination of the time intervals between the three critical events themselves, but also from evidence particular to the traffic stops on May 16 and June 30, 2006.  Specifically, the Court has looked at McCann's own acknowledgment of his vehicle's disrepair, as well as the fact that the June 30, 2006, stop was initiated only after McCann failed to yield to traffic at the same intersection that Passarella was stopped at waiting for the light to change.

15

In addition to the benign temporal proximity between the traffic stops, this Court finds that Defendants are also able to show that Passarella and Pizzico would have initiated the traffic stops and issued the citations in the absence of McCann's citizen's complaints.  As explained more fully below, we determine that the traffic stops did not violate the Fourth Amendment.

Therefore, this Court has taken "a careful eye to the specific facts and circumstances encountered," Farrell, 206 F.3d at 279, n. 5, and is satisfied that Defendants have carried their burden of showing an absence of a genuine issue of material fact with respect to the First Amendment retaliation claim.

### 2.   The Fourth Amendment Claims Against Passarella and Pizzico.

McCann claims that his Fourth Amendment rights have been infringed, and he specifically argues that "[t]he reasonableness of all the traffic stops regarding this matter is questionable." McCann is specifically referring to the traffic stops on April 27 (which he was not a party to), May 16, and June 30, 2006.  This Court will look at each stop individually to determine whether the police officers' actions pass constitutional muster.

As a preliminary matter, this Court recognizes that the Fourth Amendment to our Constitution unequivocally states that "[t]he right of the people to be secure in their

16

persons...against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Our Supreme Court has held that the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996). As such, a traffic stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Id. at 810.[6]

An assessment of reasonableness demands that the facts be judged against an objective standard; the question thus becomes "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" U.S. v. Hawkins, 811 F.2d 210, 213 (3d Cir. 1987)(quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968). "In other words, reasonable suspicion to stop and search a motorist depends on 'the events which occurred leading up to the stop or search, and then the decision whether

---

[6] Like several of its sister circuits, the Third Circuit has not read the dicta in Whren to indicate that the Supreme Court is "shifting gears, now requiring 'probable cause' as the predicate for a traffic stop." U.S. v. Delfin-Colina, 464 F.3d 392, 396. To the contrary, the Third Circuit has maintained that the constitutional standard for traffic stops in this jurisdiction is a reasonable, articulable suspicion. See id. See also U.S. v. Fleetwood, No. 06-2079, 2007 WL 1624307, at *3 (3d Cir. June 5, 2007).

these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion.'" <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996)).

The Third Circuit has determined that "[i]n situations where an objective review of the record evidence establishes reasonable grounds to conclude that the stopped individual has in fact violated the traffic-code provision cited by the officer, the stop is constitutional." <u>Delfin-Colina</u>, 464 F.3d at 399. <u>See also</u> <u>U.S. v. Kithcart</u>, 218 F.3d 213, 219 (3d Cir. 2000)("A traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of state traffic regulations")(citing <u>U.S. v. Moorfield</u>, 111 F.3d 10, 12 (3d Cir. 1997)).  Thus, a police officer need only: "(1) identify the ordinance or statute that he believed had been violated, and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction." <u>Delfin-Colina</u>, 464 F.3d at 399.

The Court first notes that McCann does not have constitutional standing to assert a claim for a Fourth Amendment violation with respect to the April 27, 2006, traffic stop.  To establish constitutional standing, a complaining party must show, among other things, that he has suffered an "injury in fact."

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103 (1998).  "Injury in fact is a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical."  ACLU v. NSA, 493 F.3d 644, 659 (6th Cir. 2007). See also Valley Forge Christian Coll. v. Ams. United for Sep. of Church & State, Inc., 454 U.S. 464, 472 (1982)("Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant").  Moreover, in the Fourth Amendment context, our Supreme Court has stated that those rights "are personal rights which...may not be vicariously asserted."  Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)(quoting Alderman v. United States, 394 U.S. 165, 174 (1969)).  See also Powers v. Ohio, 499 U.S. 400, 410 (1991).

Here, McCann was not a party to the traffic stop, either as a driver or a passenger in the vehicle.  Nor was he "searched" or "seized" by a law enforcement official within the Fourth Amendment context at any time that day.  McCann does not assert that he suffered an "injury in fact" on April 27, 2006, with regard to that specific traffic stop, nor would the facts support such an allegation.[7]  Thus, McCann does not have standing to challenge the constitutionality of the traffic stop on April 27,

---

[7] McCann's claim that Passarella was verbally abusive during this stop, of course, does not implicate the Fourth Amendment.

2006.

The Court will next turn its attention to the traffic stop of McCann's vehicle on May 16, 2006.  McCann was pulled over by Pizzico on that date for driving his vehicle with a broken taillight.  After Pizzico stated that he was pulled over because of the broken taillight, McCann was permitted to inspect the rear of his vehicle.  Upon inspection of his vehicle's taillights, McCann agreed that they were in disrepair.[8]  McCann was then issued a citation for failure to maintain his vehicle's lamps, in contravention of N.J.S.A. 39:3-66.[9]  McCann pled guilty to this offense on October 31, 2006, and was assessed a fine.  While McCann asserted in his second citizen's complaint that Pizzico "never got close enough to [the] vehicle [before initiating the traffic stop] to notice [the] small hole in [the] taillight," his later testimony under oath was indeed contradictory.  See note 7, supra.

Therefore, this Court finds factual support for an objective

---

[8] McCann confirmed the damage to the lights during his deposition:

Q:  Which side did you notice it was broken?
A:  After I got the ticket, the left side rear.
              * * *
Q:  How about the right side?
A:  The right side might have been a noticeable crack.

[9] N.J.S.A. 39:3-66 states, in pertinent part: "All lamps, reflectors and other illuminating devices required by this article shall be kept clean and in good working order..."

determination that Pizzico "could have possessed reasonable suspicion" of a specific violation of New Jersey's motor vehicle and traffic laws on May 16, 2006.  Delfin-Colina, 464 F.3d at 399.  Moreover, McCann has not identified specific facts and affirmative evidence that contradict those offered by the Defendants.  See Anderson, 477 U.S. at 256-57.

An analysis of the traffic stop on June 30, 2006, yields the same result.  According to Passarella's police report of that stop, and undisputed by McCann, Passarella watched McCann fail to yield to oncoming traffic while making a left turn onto the highway.[10]  Passarella also observed McCann's failure to use his vehicle's turn signal during this turn.  McCann's failure to yield to traffic while making a left turn is action prohibited by N.J.S.A. 39:4-90, and Passarella gave McCann a citation under that provision.[11]  Passarella also noticed that one of the brake

---

[10] Notably, Bethune, a passenger in McCann's vehicle, indicated during his deposition that McCann had in fact failed to yield to traffic on the highway to which he was turning onto: "I know there was another car there, and he had to go around it [to make] a left."

[11] N.J.S.A. 39:4-90 states, in pertinent part:

The driver of a vehicle within an intersection intending to turn to the left shall yield to a vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, but the driver having so yielded, and having given a signal when and as required by law, may make the left turn; and other vehicles approaching the intersection from the opposite direction shall

21

lights on McCann's vehicle was not working properly, and that
during the stop McCann attempted to fix the brake light by
tapping on it.[12]  Consequently, McCann was issued a citation for
failing to maintain his lamps as well.  The evidence submitted by
the parties indicates that of the two citations issued on June
30, 2006, McCann only pleaded guilty to the N.J.S.A. 39:4-90
violation (failure to yield) on October 31, 2006, for which he
was assessed a fine.

Therefore, this Court finds factual support for an objective
determination that Passarella "could have possessed reasonable
suspicion" of a specific violation of New Jersey's motor vehicle
and traffic laws on June 30, 2006.  Delfin-Colina, 464 F.3d at
399.  Moreover, as with the earlier stop, McCann has not
identified specific facts and affirmative evidence that
contradict those offered by the Defendants.  See Anderson, 477

---

yield to the driver making the left turn.

[12] McCann's deposition also indicates his acknowledgment of
the malfunctioning light:

Q:  So, he gave you permission to get out of the car?
A:  Yes.
Q:  And you went back there to check to see if your
    taillights were out?
A:  Yes.
Q:  What did you see?
A:  They were on.  I tapped them to make sure that they
    weren't, you know, like faulty or blinking or maybe when
    I hit a bump or something.  I tapped them a couple of
    times.  They went out briefly and came back on.  I
    tapped them again and they didn't go out.

U.S. at 256-57.  Thus, McCann is unable to show a genuine material issue of fact from which a reasonable jury could infer that he was deprived of his Fourth Amendment rights.

### 3.  The Fourteenth Amendment Racial Discrimination Claims Against Passarella and Pizzico

McCann has predicated his racial discrimination claim on statements made by Passarella during their encounter on April 27, 2006.  Specifically, it is undisputed that Passarella stated to McCann, among other things, that "[a]ll the people in Chesilhurst are stupid" and "[y]ou people don't know how to do anything over there."  McCann argues that a jury could reasonably infer from these two statements that the subsequent traffic stops by Pizzico and Passarella were motivated in part by racial animus.

McCann's racial discrimination claim is in essence one of selective enforcement by Passarella and Pizzico based on McCann's race, and must be analyzed accordingly.  The Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race."  Wren, 517 U.S. at 813.  As the Third Circuit has previously explained, "[t]he fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected for enforcement of a law...[E]qual protection claims under the Fourteenth Amendment require a wholly separate analysis from ... claims under the Fourth Amendment."  Carrasca v. Pomeroy, 313 F.3d 828, 836 (3d Cir. 2002).  The Third

Circuit has also stated that whereas a law enforcement officer's subjective intentions have no place in Fourth Amendment analysis, they are relevant to equal protection analysis. Gibson v. Superintendent of N.J. Dep't of Law and Pub. Safety, 411 F.3d 427, 440-41 (3d Cir. 2005).

For a selective enforcement claim to survive a motion for summary judgment, a claimant must identify through specific facts that (1) similarly situated suspects of a different race violated the motor vehicle or traffic law and were not subject to the law's enforcement and (2) the police officer's decision to instigate the traffic stop was based at least partially upon race. White v. Williams, 179 F.Supp. 2d 405, 418 n. 5 (D.N.J. 2002). See also Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002)(colorable claim for race-based discrimination established by showing that defendant's actions "(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose").

McCann has not presented this Court with any competent evidence that would suggest the Winslow Police were motivated by a race-based discriminatory purpose when they initiated traffic stops on May 16, 2006, and June 30, 2006, let alone evidence that "similarly situated suspects of a different race violated the motor vehicle or traffic law and were not subject to the law's enforcement." White, 179 F.Supp. 2d at 418 n. 5. Notably, not

24

once did any member of the Winslow Police use a racial slur or epithet, or mention race in general at all during their interactions with McCann.  Moreover, when asked during his deposition whether he thought the May 16, 2006, stop was motivated by racial animus, McCann answered that he did not.[13]

McCann's interpretation of Passarella's alleged statement, "[y]ou people don't know how to do anything over there," as something with racial overtones is unavailing.  At most it shows a lack of professionalism on the part of a certain member of the Winslow Police.  It does not, however, establish that McCann was the victim of racial discrimination.

McCann states in his brief opposing summary judgment that "[t]he Twp.s [sic] records indicate that they are stopping African Americans 33% of the time while the possible driving population of the municipality for blacks is 17."[14]  Pl. Br. at 2.  McCann does not cite to any authority for his statement, and it is unclear whether McCann is actually relying on public records or pulling numbers out of thin air.  In any event,

---

[13] The specific language of the conversation was as follows:

Q: Now, did you ever mention verbally that you thought the stop was based on race as well as being retaliatory?
A: No.  I always said I thought the stop was based on retaliation.

[14] It is unclear whether the number "17" is a percentage or a whole number.  We assume from the context that it is a percentage.

25

McCann's single unsupported statement does not establish facts
that suggest he could prove the existence of a systemic race-
based traffic-stop scheme by the Winslow Police.

Therefore, McCann is unable to show a genuine material issue
of fact from which a reasonable jury could infer that he was the
victim of racial profiling or race-based discrimination in
contravention of his Fourteenth Amendment rights.

**B.   The Constitutional Claims Against Bellos**

McCann has sued Winslow Police Chief Bellos under a theory
of respondeat superior.  McCann argues that Bellos was aware that
Passarella specifically "had some trouble with race" and was
"practicing racism upon the African Americans in [Winslow
Township]."  Pl. Br. at 2.

It is well settled that liability under § 1983 may not be
based on the doctrine of respondeat superior. See Durmer v.
O'Carroll, 991 F.2d 64, 69 n. 14 (3d Cir. 1993). Instead, the
plaintiff must show that the official's conduct caused the
deprivation of a federally protected right. See Kentucky v.
Graham, 473 U.S. 159, 166 (1985). More particularly, the
plaintiff must allege that the defendant was personally involved
in the deprivation. See West v. Atkins, 487 U.S. 42, 48 (1988).
Personal involvement can be shown if the supervisor directed the
actions of supervisees or actually knew of the actions and
acquiesced in them. Rode v. Dellarciprete, 845 F.2d 1195, 1207

26

(3d Cir. 1988).

Here, this Court finds that Bellos neither directed nor acquiesced in Passarella's and Pizzico's alleged deprivation of McCann's constitutional rights.  If anything, Bellos took McCann's allegations seriously by instigating a Winslow Police Internal Affairs Investigation concerning the report of Passarella's alleged misconduct.  Moreover, an investigation was conducted by the Camden County Prosecutor.  Neither investigation produced evidence of a constitutional violation by either Pizzico or Passarella.

Furthermore, McCann's unsupported statements in his brief that "Bellos from earlier complaints from African Americans knew that this officer had some trouble with race" and that there are "numerous complaints on file with the Twp County and State Human Relations boards" are insufficient to show personal involvement by Bellos.  Our Court of Appeals has maintained that a party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  Therefore, summary judgment must be granted as to Defendant Bellos.

## C.  The Constitutional Claims Against The Winslow Police And Winslow Township

McCann has included both the Winslow Township Police Department and the Township itself as defendants in his § 1983

27

action.  As a primary matter, a municipality and its police
department are a single entity for the purposes of § 1983
liability.  Boneberger v. Plymouth Township, 132 F.3d 20, 25 n. 4
(3d Cir. 1997).  A municipality can be liable for claims brought
pursuant to § 1983 only if it is shown that a municipal policy or
custom caused the constitutional injury.  See Leatherman v.
Tarrant County Narcotics Intelligence and Coordination Unit, 507
U.S. 163, 166 (1993); Watson v. Abington Township, 478 F.3d 144,
155 (3d Cir. 2007) (stating that liability for § 1983 must be
founded upon evidence that the government supported a violation
of constitutional rights) (citing Monell v. New York City Dept.
of Soc. Servs., 436 U.S. 658, 691-95 (1978)).

The only evidence of a "policy" or "custom" that McCann
directs our attention to stems from the rogue statistic in his
brief opposing summary judgment discussed above ("The Twp.s
records indicate that they are stopping African Americas 33% of
the time while the possible driving population of the
municipality for blacks is 17").  It bears repeating that a party
opposing summary judgment must do more than just rest upon mere
allegations.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.
2001).  Even so, this Court has taken great pains to decrypt and
draw favorable inferences from the arguments that McCann has
presented because he is litigating *pro se*.  That said, McCann has
nonetheless failed to identify a specific municipal policy or

28

custom of Winslow Township that caused his alleged constitutional injury, and therefore summary judgment as to Winslow Township is appropriate.

Finally, punitive damages are not recoverable against Winslow Township or its police department.  <u>City of Newport v. Fact Concrete, Inc.</u>, 453 U.S. 247, 271 (1981).  <u>See</u> <u>also</u> <u>Doe v. County of Centre, PA</u>, 242 F.3d 437, 455 (3d Cir. 2001)(stating that <u>City of Newport</u> stands for the proposition that state and local governments entities are immune from punitive damages under § 1983).  Thus, insofar as McCann's claim seeks punitive damages against Winslow Township and the Winslow Police, it must necessarily fail.


## IV. Conclusion

Based on the findings of this Court, Defendants' motion for summary judgment will be granted. An appropriate Order will be entered following this Opinion.


                                    ___s/Noel L. Hillman_____
Camden, New Jersey                  NOEL L. HILLMAN, U.S.D.J.

Dated: December 20, 2007